# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 29 2020, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of D.B. (Minor Child)<br><br>and<br><br>T.S. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner,*<br><br>and | April 29, 2020<br><br>Court of Appeals Case No. 19A-JT-2093<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Danielle Gaughan, Judge Pro Tempore<br><br>The Honorable Scott Stowers, Magistrate<br><br>Trial Court Cause No. 49D09-1809-JT-1115 |

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem,*

**Crone, Judge.**

## Case Summary

T.S. (Father) appeals the trial court's order terminating his parent-child relationship with his daughter, D.B. (Child). He claims that he was denied due process because the Indiana Department of Child Services (DCS) failed to prove that it sent him notice of a permanency hearing. He also maintains that the trial court clearly erred in terminating his parental rights. We affirm.

## Facts and Procedural History

Child was born to D.B. (Mother) on September 9, 2017. At birth, she tested positive for cocaine and methadone. She was placed in neonatal intensive care and remained hospitalized for about a month. At the time, Father was being held in the Grayson County Jail in Kentucky in connection with federal charges for narcotics possession with intent to deliver and possession of a firearm by a prohibited person.

In October 2017, when Child was cleared for release from the hospital, DCS removed her from Mother's care and placed her with her paternal aunt (Aunt), where she has remained since. DCS filed a petition seeking to have Child

adjudicated a child in need of services (CHINS), citing Mother's drug addiction and Child's positive drug tests at birth. Father was identified in the CHINS petition, but his whereabouts were listed as unknown. Counsel was appointed on his behalf. Father subsequently was located in the Kentucky jail, and his paternity was confirmed by a DNA test. Mother admitted to the CHINS allegations, and Father's counsel entered an admission to the CHINS allegations on his behalf. Pursuant to the CHINS dispositional order, Father was required to contact DCS within seventy-two hours after his release from prison and to secure stable housing and employment. He also was ordered to participate in a Father Engagement program. During his incarceration in Kentucky, Father participated in an Inside Out Dads Program, Narcotics Anonymous, and Alcoholics Anonymous. Between late 2017 and October 2018, Aunt brought Child for approximately ten supervised visits with Father.

[4] In August 2018, Father pled guilty to the federal charges by negotiated plea agreement. His sentence, which included a career offender enhancement, was 188 months executed, with an expected release date of 2030, followed by six years' probation.[1] Not long after, he was transferred to a Michigan federal prison to serve his sentence.

[5] During a September 12, 2018 permanency hearing, DCS sought to change the permanency plan from reunification to adoption. Father appeared at the

---

[1] The career offender provision was predicated on his prior convictions for dealing in illegal substances in 2004 and 2009. He also had a prior conviction for unlawful possession of a firearm by a serious violent felon in 2009.

permanency hearing by counsel but not in person or telephonically. The trial court acknowledged Father's participation in the programs offered at the Kentucky jail. *See* Supp. Tr. Vol. 2 at 11 ("I'm thrilled that I have a man in prison who is working on bettering his life. It's refreshing."). Father's counsel, his fourth public defender, indicated that she had just recently been appointed to the case and had not had an opportunity to consult with Father. She indicated that she had studied Father's file and that his preference was for Child to remain in Aunt's care and eventually be placed with him after his release. Aunt testified that she and Father had agreed that she should adopt Child and that they had talked about him living with her and Child on his eventual release and possibly giving Child the option of living with him once he gets established. The trial court indicated that Aunt's description of what she and Father had discussed was not adoption. The court told Father's counsel and Aunt that they needed to clarify matters with Father during the ensuing months of the termination proceedings. The trial court changed the permanency plan to adoption, citing Mother's heroin addiction and failure to engage in services, Child's need for stability and security, Child's bond with Aunt, and the fact that Father was facing a lengthy term of incarceration in federal prison.

[6]     DCS filed a termination petition, and Mother signed a consent to adoption.[2] The court conducted a factfinding hearing on June 18 and July 24, 2019, and Father appeared by counsel and participated telephonically from the Michigan

---

[2] Mother did not participate in the factfinding hearing and is not involved in this appeal.

federal prison. Father testified that although he had not seen Child since October 2018, he had been talking to her on the phone three or four times per week since then. He also expressed his desire to live with Aunt and Child when he is released from prison in 2030 and to get a job so that he can help with household expenses. Guardian ad litem (GAL) Erika Davis and two DCS family case managers (FCMs) testified that termination and adoption by Aunt are in Child's best interests. Two of these service providers were questioned concerning guardianship, versus adoption, as the best permanency plan. GAL Davis testified that she did not believe that guardianship was a satisfactory plan in this case due to Child's young age and the availability of ongoing financial help for adoptive families. Tr. Vol. 2 at 54. FCM Supervisor Laura Houston explained that guardianship is never a recommended plan for children under age thirteen because financial assistance is not available for younger children in guardianships. *Id*. at 60-61. The trial court issued an order with findings of fact and conclusions thereon, terminating Father's parental relationship with Child. Father now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### Section 1 – Father waived his due process argument by failing to raise it in the trial court.

Father first contends that he was denied due process, claiming that DCS failed to prove that it provided him notice of the permanency hearing changing the plan from reunification to adoption. When seeking to terminate a parent-child relationship, the State must satisfy the requirements of the Due Process Clause

of the Fourteenth Amendment to the United States Constitution. *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013). This means that the State must proceed in a fundamentally fair manner that affords parents the opportunity to be heard at a meaningful time and in a meaningful manner. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011).

[8] Father's complaint pertains to one of the CHINS permanency hearings, not to one of the termination hearings. We acknowledge the intertwined nature of CHINS and termination proceedings and the fact that due process protections are vital throughout the CHINS proceedings due to their potential to interfere with a parent's upbringing of his child. *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014). The statute governing permanency hearings includes requirements that the court consider and approve a permanency plan, consider the recommendations of certain persons including parents, determine whether the existing plan must be modified, and examine procedural safeguards used by DCS to protect parental rights. Ind. Code § 31-34-21-7(b). Those procedural safeguards include a requirement that DCS give the parent seven days' notice of a permanency hearing. *See* Ind. Code § 31-34-21-4(a) ("at least seven (7) days before the periodic case review, including a case review that is a permanency hearing under section 7 of this chapter, [DCS] shall provide notice of the review to … [t]he child's parent and [parent's] attorney"). "[DCS] shall present proof of service of the notice required … at the periodic review." Ind. Code § 31-34-21-4(b). The parent is among those persons with the right to submit a written

statement to the court listing his permanency recommendations and to present oral testimony and cross-examine witnesses. Ind. Code § 31-34-21-4(d).

[9]     Father alleges that DCS failed to prove that it provided him the required notice so that he could be heard in a meaningful manner at the September 2018 permanency hearing.[3] The CHINS chronological case summary does not indicate whether (or to what address) DCS sent Father such notice. Petitioner's Ex. 1. Based on our review of the record as a whole, Father appears to be correct that DCS did not prove that it sent him the required notice of the September 2018 permanency hearing. However, he was represented by counsel at that hearing, and his counsel did not raise the notice issue in the trial court, either during that hearing or at any time thereafter. Counsel indicated that she was brand new to the case and had not yet consulted with Father personally but had studied his file. She did not know whether he had received notice of the hearing but stated that his file indicated his general preference to appear telephonically at hearings and that she had not arranged for that. The hearing took place just after Father's sentencing in his federal criminal case, around the time that he was transferred from the county jail in Kentucky to the federal

---

[3] Indiana courts have held that the parent's right to be heard does not mean that a parent has an absolute right to be physically present at the hearing; rather, the parent's appearance by counsel has been held to satisfy the requirements of due process. *See*, *e.g.*, *Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 184 (Ind. Ct. App. 2006) (finding no due process violation where incarcerated father appeared only by counsel at permanency hearing); *see also C.G.*, 954 N.E.2d at 920-21 (telephonic participation of incarcerated parent at termination factfinding hearing held not to amount to due process violation); *cf. In re K.W.*, 12 N.E.2d 241, 248-49 (Ind. 2014) (fact that parent has no absolute constitutional right to be personally present at termination hearing does not mean procedural fairness was satisfied if parent "was not heard at any time or in any manner.").

prison in Michigan. At any rate, his counsel asked for a continuance, which was denied, but did not object on the basis of insufficient notice to Father.

[10] Although procedural irregularities during CHINS and termination proceedings may be of such significance that they deprive a parent of procedural due process, the parent must raise due process claims at the trial level to avoid waiver. *S.L.*, 997 N.E.2d at 1120; *see also McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2000) (a party may waive a constitutional claim, including due process, by raising it for the first time on appeal).

> Compliance with the statutory procedure of the juvenile code is mandatory to effect termination of parental rights. Although statutory notice is a procedural precedent that must be performed prior to commencing an action, it is not an element of plaintiff's claim. Failure to comply with statutory notice is thus a defense that must be asserted. Once placed in issue, the plaintiff bears the burden of proving compliance with the statute.

*In re T.W.*, 831 N.E.2d 1242, 1246 (Ind. Ct. App. 2005) (citations and quotation marks omitted).

[11] Here, the CHINS chronological case summary, Petitioner's Exhibit 1, includes no entry indicating that, in the months following the September 2018 permanency hearing, Father ever filed an objection concerning his alleged lack of notice of that hearing or that he raised the notice issue during either of two subsequent CHINS hearings held in January and April 2019. Additionally, he did not raise the notice issue during the termination factfinding hearing, where

he appeared both telephonically and by counsel. As such, he did not provide the trial court "a bona fide opportunity to pass upon the merits" of his due process claim before seeking an opinion on appeal. *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004). Thus, he has waived the issue for our consideration.

Notwithstanding, Father characterizes DCS's failure to prove that it sent him notice as fundamental error due to what he characterizes as the "domino" effect of the change of the permanency plan. Appellant's Br. at 18. Error is "fundamental" if it is so prejudicial to the rights of the respondent that it makes a fair proceeding impossible. *Matter of D.G.*, 702 N.E.2d 777, 779 n.2 (Ind. Ct. App. 1998). As discussed more fully below, the matter about which Father complains, i.e., that guardianship, not termination, is in Child's best interests, was thoroughly litigated during the termination factfinding hearing, where Father appeared both telephonically and by counsel and therefore was meaningfully heard. Thus, Father has failed to establish prejudice.

## Section 2 – Father has failed to establish that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied.

Father also contends that the trial court erred in terminating his parental relationship with Child. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we

first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.G.*, 45 N.E.3d 471, 476 (Ind. Ct. App. 2015), *trans. denied* (2016). Unchallenged findings stand as proven, and we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*; *see also McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged findings are accepted as true). In conducting our review, we neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

[14] "Parents have a fundamental right to raise their children – but this right is not absolute. When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated." *Matter of Ma.H.*, 134 N.E.3d 41, 45-46 (Ind. 2019) (citation omitted). To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

....

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[15]     In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the

child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted). "[I]f the court finds that the allegations in a [termination] petition … are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

[16] Father asserts that the trial court clearly erred in concluding that a reasonable probability exists that the conditions that led to Child's removal and continued placement outside the home will not be remedied.[4] When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *E.M.*, 4 N.E.3d at 643. "Due to the permanent effect of

---

[4] Father also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only one of the three circumstances listed. Because we find no error concerning the reasonable probability that the conditions prompting Child's removal will not be remedied, we need not address the threat to Child's well-being.

termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *J.T.*, 742 N.E.2d at 512. In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride*, 798 N.E.2d at 199.

[17] Father correctly points out that the conditions that prompted Child's initial removal pertained to Mother. However, Father's incarceration contributed to Child's continued placement with Aunt. With respect to the reasonable probability that these conditions will remain unremedied, Father specifically challenges only the court's ultimate finding, which reads,

> 20. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside of the home will not be remedied by [Father]. [Father] has been incarcerated for [Child's] entire life and will not be released until 2030 at which time [Child] will be thirteen (13) years of age. Father has no viable plan for supporting the child or even himself upon his release from prison.

Appealed Order at 2.

[18] We acknowledge Father's assertion that his parental rights should not be terminated solely on the basis of his incarceration. Our supreme court has

emphasized that incarceration is an insufficient basis upon which to terminate a parent's rights. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015) (citing *In re G.Y.*, 904 N.E.2d 1257, 1264-66 (Ind. 2009)). Here, the trial court chronicled Father's lengthy criminal history, observing the following: that he had been imprisoned for drug-related offenses from 2004 to 2006, after which he returned to his pattern of dealing drugs and also unlawfully possessed firearms; this precipitated a longer term of incarceration from 2009 to 2013, followed by another cycle of drug dealing and firearms offenses. This time, the sum of Father's past and present offenses landed him an enhanced sentence of over fifteen years in federal prison, with an expected release date of 2030. Father testified that he was not addicted to drugs but was addicted to distributing them. Tr. Vol. 2 at 22. Based on our reading of the record and the order, we conclude that it was not Father's incarceration, per se, that formed the basis for termination; rather, it was the fact that he was not due to be released for another eleven years, coupled with his pattern of reverting to increasingly dangerous criminal behavior after each of his previous releases from incarceration.

[19] As for Father's plan to support himself and Child when he is released from prison, he testified that he intends to move in with Aunt and Child and try to build his relationship with Child, who will be nearly thirteen years old. He also testified that he believed he could get a job and help pay the bills. These assertions are general and speculative, especially since they involve job prospects nearly eleven years down the road and involve a job applicant who

has an extensive criminal record and will be on probation for six years upon his release. We find no clear error in the trial court's ultimate finding that there is a reasonable probability that the conditions that precipitated Child's removal and continued placement outside the home will not be remedied.

## Section 3 – Father has failed to establish that the trial court clearly erred in concluding that termination is in Child's best interests.

[20] Father also challenges the trial court's conclusion that termination of the parent-child relationship is in Child's best interests. To determine what is in the best interests of a child, we must look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). The trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*. Although not dispositive, permanency and stability are key considerations in determining the child's best interests. *G.Y.*, 904 N.E.2d at 1265. "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (quoting *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*). Likewise, "the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[21] Father's best-interests argument essentially focuses on whether adoption is a satisfactory plan for Child. The statutory requirement that DCS establish that "there is a satisfactory plan for the care and treatment of the child" has not typically been a difficult hurdle to overcome. *See In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) ("Indiana courts have traditionally held that for a plan to be 'satisfactory,' for the purposes of the termination statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'") (quoting *Lang*, 861 N.E.2d at 365), *trans. denied*. Where, as here, the plan involves adoption by an aunt who has cared for a nearly two-year-old child since shortly after her birth, the satisfactory-plan requirement is easily established. What Father essentially maintains is that adoption, while satisfactory in a general sense, is not the plan that satisfies the best-interests requirement.

[22] A significant portion of the factfinding hearing addressed the issue of whether adoption or guardianship is in Child's best interests. GAL Davis and FCM Supervisor Houston were questioned concerning guardianship as a possible permanency plan. These service providers articulated the differences between the two options, and each considered it significant that there is financial assistance available to adoptive families but not to those who serve as guardians for children under age thirteen. They also explained that while guardianship is considered a more viable option when a child is in her teens, adoption is generally preferred for children who are extremely young, as in this case. Even though Aunt was not in need of financial assistance as of the date of the

factfinding hearing, the service providers noted that Child is presently receiving occupational and speech therapy through DCS, and they expressed their concern that once Aunt would begin to bear the expense of Child's treatment and services, she might discover that she needs financial assistance, especially in a guardianship that spans such a protracted period.

[23] As support for his argument for a guardianship, Father relies on *In re R.S.*, where our supreme court stated, "when a child is in relative placement, and the permanency plan is adoption into the home where the child has lived for years already, prolonging the adoption is unlikely to have an effect upon the child." 56 N.E.3d 625, 630 (Ind. 2016). In *R.S.*, the consensus among the service providers was that the child shared a close bond with his father. *Id.* at 627-28. Despite testimony from the family case manager, therapist, and guardian ad litem that adoption by the grandmother was in R.S.'s best interests, the guardian ad litem nevertheless recommended continued visitation between the child and his father. *Id.* at 628. R.S. was ten years old at the time of the factfinding hearing, and the father had been incarcerated for three years and three months. *Id.* at 626. In contrast, here, Child was not yet two years old at the time of the factfinding hearing, and Father has been incarcerated since her birth, has never lived with her, and would not be available to live with her until

his release in 2030, when she will be nearly thirteen years old.[5] Thus, *R.S.* is distinguishable.

[24] In sum, the trial court's decision to terminate Father's relationship with Child was not based solely on the fact that he was incarcerated, nor was it simply a matter of Aunt providing a "better" home. *See In re R.A.*, 19 N.E.3d 313, 321 (Ind. Ct. App. 2014) (mere fact children are in better home cannot be sole basis for termination), *trans. denied* (2015). Rather, the court considered the totality of the circumstances, including Father's pattern of committing increasingly serious offenses, his lengthy sentence with an expected release date of 2030, Child's need for stability and permanency, and Child's strong bond with Aunt at the only home she has ever known. Child is currently two years old. Even if Father is able to break his cycle of reverting to criminal activity and can accomplish his goals of securing a job in 2030 and helping Aunt navigate Child's teen years, Child needs stability and should not have to wait a decade to have these matters resolved. Father has failed to demonstrate clear error in the trial court's decision to terminate his parental relationship with Child. Accordingly, we affirm.

---

[5] We acknowledge Father's assertion that it would take a court decision to dissolve Aunt's guardianship over Child. However, our courts have long held that where a parent is attempting to (re)gain custody of a child in custody of a third party, "[t]here is a strong presumption that a child's interests are best served by placement with the natural parent … [and the] parent's burden to show a modification of custody is justified is minimal." *Matter of Guardianship of I.R.*, 77 N.E.3d 810, 813 (Ind. Ct. App. 2017).

Affirmed.

May, J., and Pyle, J., concur.